1  Jennifer Lynch (SBN 240701)
2  *jlynch@eff.org*
   ELECTRONIC FRONTIER FOUNDATION
3  815 Eddy Street
   San Francisco, CA 94109
4  Telephone: (415) 436-9333
   Facsimile: (415) 436-9993
5
   Attorney for Plaintiff
6  ELECTRONIC FRONTIER FOUNDATION

7

8                    **UNITED STATES DISTRICT COURT**

9              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                        **OAKLAND DIVISION**

11

12

13  ELECTRONIC FRONTIER FOUNDATION,        )  Case No.: 4:12-cv-5580 PJH
                                           )
14              Plaintiff,                 )  **NOTICE OF CROSS MOTION AND**
                                           )  **CROSS MOTION FOR SUMMARY**
15         v.                              )  **JUDGMENT; MEMORANDUM OF**
                                           )  **POINTS AND AUTHORITIES IN**
16  DEPARTMENT OF HOMELAND SECURITY,       )  **SUPPORT OF CROSS MOTION FOR**
                                           )  **SUMMARY JUDGMENT**
17              Defendant.                 )
                                           )  **AND**
18                                         )
                                           )  **OPPOSITION TO DEFENDANT'S**
19                                         )  **MOTION FOR SUMMARY JUDGMENT**
                                           )
20                                         )  Date:      Dec. 11, 2013
                                           )  Time:      9:00 A.M.
21                                         )  Place:     Courtroom 3, 3rd Floor
                                           )  Judge:     Hon. Phyllis J. Hamilton
22  ─────────────────────────────────     )

23

24

25

26

27

28

**NOTICE OF MOTION**

TO DEFENDANT AND ITS COUNSEL OF RECORD:

     PLEASE TAKE NOTICE that on December 11, 2013, or as soon thereafter as the matter may be heard in Courtroom 3 on the 3rd Floor at 1301 Clay Street in Oakland, California, plaintiff Electronic Frontier Foundation (EFF) will, and hereby does, cross move for summary judgment.

     Pursuant to Federal Rule of Civil Procedure 56, EFF seeks a court order requiring the Department of Homeland Security and its component Customs & Border Protection to release records under the Freedom of Information Act (FOIA). EFF respectfully asks that this Court issue an order requiring the government to release all records improperly withheld from the public. This Cross Motion is based on this notice of Cross Motion, the memorandum of points and authorities in support of this Cross Motion, and all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

DATED:  October 23, 2013          Respectfully submitted,

                    By:    _/s/ Jennifer Lynch_____
                         Jennifer Lynch, Esq.
                         ELECTRONIC FRONTIER FOUNDATION
                         815 Eddy St.
                         San Francisco, CA  94109
                         Telephone: (415) 436-9333
                         Facsimile: (415) 436-9993

                         Attorney for Plaintiff
                         ELECTRONIC FRONTIER FOUNDATION

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................1

        A.      Use of Drones in the United States .........................................................1

        B.      Customs and Border Protection's Unmanned Aircraft ...............................3

        C.      Public Attitude About Drones...................................................................6

        D.      EFF's FOIA Requests For Records Related to CBP's Drone Flights........................7

III.    ARGUMENT ........................................................................................................7

        A.      The Freedom of Information Act and the Standard of Review...................7

        B.      EFF is Entitled to Summary Judgment Because the Government Has Improperly
                Withheld Agency Records ........................................................................9

                1.      Defendant Improperly Withheld Records Under Exemption 7(E) ...............9

                        (a)     Daily Reports—Location Information .............................10

                        (b)     Daily Reports—Type of Operation and Operational Capabilities ....12

                        (c)     CONOPS Report .........................................................15

                2.      Defendant Has Failed to Segregate and Release All Non-Exempt
                        Information from the CONOPS Report .......................................17

IV.     CONCLUSION .................................................................................................18

## TABLE OF AUTHORITIES

### Federal Cases

*Albuquerque Publishing Co. v. Dept. of Justice,*
  726 F. Supp. 851 (D.D.C. 1989) .......................................................................13

*Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State,*
  818 F. Supp. 1291 (N.D. Cal. 1992) .................................................................17

*Birch v. USPS,*
  803 F.2d 1206 (D.C. Cir. 1986) .........................................................................9

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.,*
  601 F.3d 143 (2d Cir. 2010)...............................................................................9

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ...........................................................................................8

*Church of Scientology of Cal. v. Dep't of Army,*
  611 F.2d 738 (9th Cir. 1979)..............................................................................9

*Council on American-Islamic Relations, Cal. v. FBI,*
  749 F. Supp. 2d 1104 (S.D. Cal. 2010) ...........................................................10

*Davin v. DOJ,*
  60 F.3d 1043 (3d Cir. 1995)..............................................................................10

*Dep't of Air Force v. Rose,*
  425 U.S. 352 (1976) ...........................................................................................8

*DOJ v. Reporters Comm. for Freedom of the Press,*
  489 U.S. 749 (1989) ........................................................................................8, 9

*DOJ v. Tax Analysts,*
  492 U.S. 136 (1989) ...........................................................................................8

*Dunaway v. Webster,*
  519 F. Supp. 1059 (N.D. Cal. 1981) .................................................................13

*Durrani v. DOJ,*
  607 F. Supp. 2d 77 (D.D.C. 2009) ...................................................................13

*EFF v. Dept. of Transp.,*
  Case No. 12-00164 CW (N.D. Cal. 2012) ..........................................................6

*EFF v. DOD,*
  Case No. 09-05640 SI, 2012 U.S. Dist. LEXIS 137010 (N.D. Cal. Sept. 24, 2012)............10

*Feshbach v. SEC,*
   5 F. Supp. 2d 774 (N.D. Cal. 1997) .................................................................8, 10

*Goland v. CIA,*
   607 F.2d 339 (D.C. Cir. 1978) ...............................................................................9

*Gordon v. FBI,*
   388 F. Supp. 2d 1028 (N.D. Cal. 2005) ...........................................................9, 10

*Hamilton v. Weise,*
   No. 95-1161, 1997 U.S. Dist. LEXIS 18900 (M.D. Fla. Oct. 1, 1997) ...............13

*Kamman v. IRS,*
   56 F.3d 46 (9th Cir. 1995).......................................................................................9

*Lewis-Bey v. DOJ,*
   595 F. Supp. 2d 120 (D.D.C. 2009) ....................................................................13

*Mead Data Cent., Inc. v. Dep't of the Air Force,*
   566 F.2d 242 (D.C. Cir. 1977) .........................................................................9, 17

*Nat'l Wildlife Fed'n v. U.S. Forest Service,*
   861 F.2d 1114 (9th Cir. 1988) ...............................................................................8

*NLRB v. Robbins Tire & Rubber Co.,*
   437 U.S. 214 (1978) ...............................................................................................8

*NRDC v. DOD,*
   388 F. Supp. 2d 1086 (C.D. Cal. 2005).................................................................17

*Rosenfeld v. DOJ,*
   57 F.3d 803 (9th Cir. 1995)..............................................................................10, 13

*Wiener v. FBI,*
   943 F.2d 988 (9th Cir. 1991)..................................................................................17

*Willamette Indus. v. United States,*
   689 F.2d 865 (9th Cir. 1982) .................................................................................17

**Federal Statutes**

5 U.S.C. § 552 ...................................................................................................................1

5 U.S.C. § 552(a)(4)(B).................................................................................................9, 17

5 U.S.C. § 552(b) .......................................................................................................8, 17, 18

5 U.S.C. § 552(b)(7)(E)...................................................................................9, 10, 15, 16

-iii-

CASE NO: 12-CV-5580 PJH    NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM.
J.; OPP. TO DEF'S MOT. SUMM. J.

**Federal Rules**

Fed. R. Civ. P. 56(a) .................................................................................................................8

**Other Authorities**

2LT Website Administrator, *How to Hide from Predator Drones UAV – Unmanned Aerial Vehicles Survival Guide*, Mar. 24, 2013 .................................................................15

420Homestead, *Drone Sighting in Arizona*, YouTube (Feb. 22, 2013)..............................12

Allie Bohm, *Status of Domestic Drone Legislation in the States*, ACLU Blog, Oct. 9, 2013...........6

*Al Qaeda Drone Guide: 22 Steps To Evading Unmanned Aircraft Strikes*, Huffington Post, Feb. 22, 2013 ...............................................................................................................15

Andrew Becker & G.W. Schulz, *At U.S. Border, Expensive Drones Generate Lots of Buzz, Few Results*, Center for Investigative Reporting, June 15, 2012 ....................................12, 14

Andrew Becker, *New Drone Radar Reveals Border Patrol 'Gotaways' in High Numbers*, Center for Investigative Reporting, Apr. 4, 2013.........................................................*passim*

Andrew Munchbach, *US Army's A160 Hummingbird Drone-Copter to Don 1.8 Gigapixel Camera*, Engaget, Dec. 27, 2011 .......................................................................................2

Andy Greenberg, *Flying Drone Can Crack Wi-Fi Networks, Snoop On Cell Phones*, Forbes, July 28, 2011 .......................................................................................................................2

Brian Bennett, *Immigration Bill Would Restrict Drone Use in California*, L.A. Times, May 14, 2013 .......................................................................................................................6

Brian Bennett, *Police Employ Predator Drone Spy Planes on Home Front*, L.A. Times, Dec. 10, 2011 ..................................................................................................................1, 2, 5

Brian Bennett, *Predator Drones Have Yet to Prove their Worth on Border*, L.A. Times, Apr. 28, 2012.......................................................................................................................5

Chad C. Haddal & Jeremiah Gertler, *Homeland Security: Unmanned Aerial Vehicles and Border Surveillance*, Congressional Research Service (July 8, 2010)................................................15

David Axe, *New Armed Stealth Drone Heads to Afghanistan (And Maybe Iran, Too)*, Wired Danger Room Blog, Dec. 13, 2011 ...............................................................................2

Declan McCullagh, *U.S. was Warned of Predator Drone Hacking*, CBS News, Dec. 17, 2009 .....14

DHS Office of Inspector General, *CBP's Use of Unmanned Aircraft Systems in the Nation's Border Security* (May 30, 2012) .................................................................3, 4, 5, 7

-iv-

DHS, *Wide Area Aerial Surveillance System, Draft RFP, Solicitation No. RSBR-12-00016* ............ 4

Eric Schmitt, *A Nation at War: Military Aircraft; In the Skies Over Iraq, Silent Observers Become Futuristic Weapons,* N.Y. Times, Apr. 18, 2003 ...................................................... 2

FAA, *Fact Sheet* ........................................................................................................................ 2

General Atomics Aeronautical, *Predator B UAS* ................................................................... 13

*Israel Unveils Drones Able to Hit Iran*, N.Y. Times, Feb. 21, 2010 ..................................... 1

Jane Perlez & Pir Zubair Shah, *Drones Batter Al Qaeda and Its Allies Within Pakistan*, N.Y. Times, Apr. 4, 2010 ............................................................................................................... 2

Jason Paur, *Video: Hummingbird Drone Does Loop-de-Loop*, Wired Danger Room Blog, Feb. 18, 2011 ........................................................................................................................ 1

Nidhi Subbaraman, *Drones Crash (a lot) but the Military's Safety Lessons May Help Civilians*, NBC News, Mar. 20, 2013 ................................................................................................. 14

Peter Finn, *Domestic Use of Aerial Drones by Law Enforcement Likely to Prompt Privacy Debate*, Wash. Post, Jan. 23, 2011 ...................................................................................... 3

Pima County Attorney's Office, Criminal Division ................................................................. 12

Pima County, Arizona, *About Pima County* ......................................................................... 11

Robert Stanton, *Texas Civil Libertarians Have Eye on Police Drones*, Hous. Chron., Oct. 31, 2011 .................................................................................................................. 2, 3

Somini Sengupta, *U.S. Border Agency Allows Others to Use Its Drones*, N.Y. Times, July 3, 2013 ..................................................................................................................... 2, 3

Spencer Ackerman, *Homeland Security Wants to Spy on 4 Square Miles at Once*, Wired Danger Room Blog, Jan. 23, 2012 ................................................................................................... 4

Stephen Dean, *New Police Drone Near Houston Could Carry Weapons*, Click2Houston.com, Nov. 10, 2011 ...................................................................................................................... 2

Testimony of Michael C. Kostelnik, Assistant Commissioner, Office of Air and Marine, U.S. Customs and Border Protection (July 15, 2010) ............................................................ 14, 16

Timothy Coon, *First Hand Account of Predator Drone Sighting*, YouTube (Jul. 26, 2013) ........... 12

Tom Barry, *The Numbers Game: Government Agencies Falsely Report Meaningless Deportations and Drug Seizures as Victories*, Center for International Policy, Jan. 16, 2012 ..................................................................................................................... 14

-v-

CASE NO: 12-CV-5580 PJH    NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.; OPP. TO DEF'S MOT. SUMM. J.

U.S. Air Force, MQ-1B Predator Fact Sheet (July 20, 2010) .................................................3

U.S. Customs & Border Protection, *CBP Receives Fourth Predator-B in Arizona*,
    (Dec. 27, 2011)...............................................................................................................11

U.S. Customs & Border Protection, *Concept of Operations for CBP's Predator B*
    *Unmanned Aircraft System, Fiscal Year 2010 Report to Congress* (June 29, 2010).....*passim*

U.S. Customs & Border Protection, *Fact Sheet: Unmanned Aircraft System MQ-9 Predator B* .......3

Virginia General Assembly Legislative Information System, *An Act to Place a Moratorium*
    *on the Use of Unmanned Aircraft Systems*, Apr. 3, 2013 .....................................................6

W.J. Hennigan, *Air Force buys souped-up, stealthy version of Predator drone*, L.A. Times,
    Dec. 30, 2011 ...............................................................................................................1

W.J. Hennigan, *It's a Bird! It's a Spy! It's Both*, L.A. Times, Feb. 17, 2011 ...................................1

Wikipedia, *County Statistics of the United States*...............................................................11

Wikipedia, *General Atomics MQ-9 Reaper* ......................................................................14

Wikipedia, *Lidar* .......................................................................................................1

Wikipedia, *LIDAR Speed Gun* .....................................................................................1

Wikipedia, *Maricopa County, Arizona* ...........................................................................11

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

This action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeks the disclosure of records held by Defendant Department of Homeland Security (DHS) and its component Customs & Border Protection (CBP) concerning the agency's use of unmanned aircraft (commonly known as drones). Defendant has moved for summary judgment, asking the Court to sustain its decision to withhold a substantial portion of the requested material. Because the agency has failed to meet its burden, the Court should deny the government's motion for summary judgment and grant EFF's Cross Motion. EFF respectfully requests entry of an order compelling Defendant to disclose all improperly withheld records.

## II.     STATEMENT OF FACTS

### A.      Use of Drones in the United States

Drones come in many shapes and sizes, from as large as a commercial airplane[1] to as small as a hummingbird.[2] They do not have a pilot onboard but are instead operated remotely from the ground—either within visual line of site of the aircraft or from many miles away. Drones can carry various types of equipment that allow them to conduct highly sophisticated and almost constant surveillance, including video and infrared cameras, heat sensors, radar, laser imaging and speed detection technology,[3] license plate readers, and face recognition.[4] Some newer drones can carry

---

[1] *See Israel Unveils Drones Able to Hit Iran*, N.Y. Times, Feb. 21, 2010, https://www.nytimes.com/2010/02/22/world/middleeast/22mideast.html (noting Israel owns a fleet of drones, each the size of a Boeing 737); *see also* W.J. Hennigan, *Air Force buys souped-up, stealthy version of Predator drone*, L.A. Times, Dec. 30, 2011, http://latimesblogs.latimes.com/money_co/2011/12/drone-general-atomics-air-force-.html (noting the Air Force recently purchased a drone with a 66 foot wingspan and a top speed of 460 mph).

[2] W.J. Hennigan, *It's a Bird! It's a Spy! It's Both*, L.A. Times, Feb. 17, 2011, http://articles.latimes.com/2011/feb/17/business/la-fi-hummingbird-drone-20110217; Jason Paur, *Video: Hummingbird Drone Does Loop-de-Loop*, Wired Danger Room Blog, Feb. 18, 2011, http://www.wired.com/dangerroom/2011/02/video-hummingbird-drone-can-perform-loops/.

[3] *See, e.g.*, Wikipedia, *Lidar*, https://en.wikipedia.org/wiki/Lidar (as of Oct. 22, 2013, 9:42 GMT); Wikipedia, *LIDAR Speed Gun*, https://en.wikipedia.org/wiki/LIDAR_speed_gun (as of Oct. 22, 2013, 9:42 GMT).

[4] Brian Bennett, *Police Employ Predator Drone Spy Planes on Home Front*, L.A. Times, Dec. 10, 2011, http://articles.latimes.com/2011/dec/10/nation/la-na-drone-arrest-20111211 (describing

-1-

super high-resolution "gigapixel" cameras that can track up to 65 people and multiple vehicles simultaneously from altitudes above 20,000 feet.[5] Equipment carried by drones can break into Wi-Fi networks and intercept text messages and cell phone conversations—without the knowledge or help of either the communications provider or the customer.[6] Drones flown abroad also, notoriously, carry weapons.[7] Some domestic agencies, including Customs & Border Protection, have considered equipping U.S. drones with weapons as well.[8]

In the past, drones have been used almost exclusively by the military and security organizations.[9] In the last few years, however, interest has grown in using drones domestically for a broad range of other uses, including "aerial photography, surveying land and crops, [and] monitoring forest fires and environmental conditions."[10] Drones are also increasingly being used for routine state and local law enforcement activities, from catching cattle rustlers[11] and drug

---

Predator drones used to aid local law enforcement that contain "high-resolution cameras, heat sensors and sophisticated radar" as well as live video feed).

[5] Andrew Munchbach, *US Army's A160 Hummingbird Drone-Copter to Don 1.8 Gigapixel Camera*, Engadget, Dec. 27, 2011, http://www.engadget.com/2011/12/27/us-armys-a160-hummingbird-drone-copter-to-don-1-8-gigapixel-cam/.

[6] *See* Andy Greenberg, *Flying Drone Can Crack Wi-Fi Networks, Snoop On Cell Phones*, Forbes, July 28, 2011, http://www.forbes.com/sites/andygreenberg/2011/07/28/flying-drone-can-crack-wifi-networks-snoop-on-cell-phones/.

[7] Eric Schmitt, *A Nation at War: Military Aircraft; In the Skies Over Iraq, Silent Observers Become Futuristic Weapons*, N.Y. Times, Apr. 18, 2003, http://www.nytimes.com/2003/04/18/world/nation-war-military-aircraft-skies-over-iraq-silent-observers-become-futuristic.html; Jane Perlez & Pir Zubair Shah, *Drones Batter Al Qaeda and Its Allies Within Pakistan*, N.Y. Times, Apr. 4, 2010, https://www.nytimes.com/2010/04/05/world/asia/05drones.html; David Axe, *New Armed Stealth Drone Heads to Afghanistan (And Maybe Iran, Too)*, Wired Danger Room Blog, Dec. 13, 2011, http://www.wired.com/dangerroom/2011/12/stealth-drone-afghanistan/;

[8] Somini Sengupta, *U.S. Border Agency Allows Others to Use Its Drones*, N.Y. Times, July 3, 2013, http://www.nytimes.com/2013/07/04/business/us-border-agency-is-a-frequent-lender-of-its-drones.html; Robert Stanton, *Texas Civil Libertarians Have Eye on Police Drones*, Hous. Chron., Oct. 31, 2011, http://www.chron.com/news/houston-texas/article/Texas-civil-libertarians-have-eye-on-police-drones-2245644.php; Stephen Dean, *New Police Drone Near Houston Could Carry Weapons*, Click2Houston.com, Nov. 10, 2011, http://www.click2houston.com/news/New-Police-Drone-Near-Houston-Could-Carry-Weapons/-/1735978/4717922/-/59xnnez/-/index.html.

[9] *See* FAA, *Fact Sheet* at 1.

[10] FAA, *Fact Sheet* at 1.

[11] Bennett, *supra* note 4.

-2-

CASE NO: 12-cv-5580 PJH    NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.; OPP. TO DEF'S MOT. SUMM. J.

dealers[12] to finding missing persons.[13] Some within law enforcement have even proposed using drones to record traffic violations.[14]

**B.    Customs and Border Protection's Unmanned Aircraft**

CBP has a fleet of ten Predator B drones.[15] These are unarmed versions of drones the military flies in Afghanistan and Iraq, and have been used by the military abroad since 1995.[16] Predator drones are about the size of a small regional commercial airplane and can fly at altitudes of 50,000 feet for up to 20 hours without stopping to refuel.[17] According to a Concept of Operations Report (CONOPS Report) prepared for Congress and released in response to this lawsuit, CBP flies its drones seven days a week for 16 hours per day.[18] By 2016, CBP plans to increase its drone fleet to 24 Predators and will use those drones to conduct surveillance 24 hours per day, 7 days per week.[19]

CBP drones are based in Arizona, Texas, Florida, and North Dakota,[20] but they are flown throughout the United States. These drones "provide reconnaissance, surveillance, targeting, and acquisition (RSTA) capabilities across all CBP areas of responsibility" and include "capabilities,

---

[12] Peter Finn, *Domestic Use of Aerial Drones by Law Enforcement Likely to Prompt Privacy Debate*, Wash. Post, Jan. 23, 2011, http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204111.html.

[13] Stanton, *supra* note 8.

[14] Finn, *supra* note 12 (noting that a "senior officer in Houston then mentioned to reporters that drones might ultimately be used for recording traffic violations").

[15] Sengupta, *supra* note 8.

[16] Schmitt, *supra* note 7; U.S. Air Force, MQ-1B Predator Fact Sheet (July 20, 2010), http://www.af.mil/AboutUs/FactSheets/Display/tabid/224/Article/104469/mq-1b-predator.aspx.

[17] U.S. Customs & Border Protection, *Fact Sheet: Unmanned Aircraft System MQ-9 Predator B*, http://www.cbp.gov/linkhandler/cgov/newsroom/fact_sheets/marine/uas.ctt/uas.pdf (last visited Oct. 22, 2013).

[18] U.S. Customs & Border Protection, *Concept of Operations for CBP's Predator B Unmanned Aircraft System, Fiscal Year 2010 Report to Congress*, 52 (June 29, 2010) *available at* www.eff.org/document/customs-border-protection-2010-drone-concept-operations-report-congress [hereinafter *CONOPS Report*] (listing current Operations Tempo).

[19] *Id.* (listing projected 2016 Operations Tempo).

[20] DHS Office of Inspector General, *CBP's Use of Unmanned Aircraft Systems in the Nation's Border Security* (May 30, 2012), 2, http://www.oig.dhs.gov/assets/Mgmt/2012/OIG_12-85_May12.pdf [hereinafter *DHS OIG Drone Report*].

-3-

CASE NO: 12-CV-5580 PJH     NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.; OPP. TO DEF'S MOT. SUMM. J.

such as the ability to carry a variety of sensors and payloads and to remain airborne for extended periods without the limitations imposed by requiring onboard pilots."[21]

The CONOPS Report notes that CBP's Predators have highly sophisticated surveillance systems. The technology includes high resolution Synthetic Aperture Radar, color video, and electron optical and infrared cameras. The drones are capable of tracking multiple moving and stationary targets of interest in both clear and adverse weather.[22]

CBP hopes to improve its surveillance capabilities in the future so that its sensor "point target resolution" increases to "well below one foot," allowing the agency to detect humans in the water.[23] In early 2012, CBP solicited industry feedback on developing a "Wide Area Surveillance System" that would allow it to conduct "persistent" surveillance—constant video or infrared imaging of a given area for the 20 hours the drone is aloft—over five to ten square kilometers.[24] When not in persistent surveillance mode, DHS stated the system should be able to surveil "long linear areas, tens to hundreds of kilometers in extent, such as open, remote borders and including an automated, real time, motion detection capability that cues a spotter imager for target identification."[25] CBP appears to be deploying this or very similar technology now. The agency released records in response to a Center for Investigative Reporting FOIA request that show CBP has been using an "all-seeing radar system . . . [that] can reveal every man, woman and child under its gaze from a height of about 25,000 feet" since March 2012.[26] This sensor, "[d]ubbed-

---

[21] *Id.*

[22] *CONOPS Report*, *supra* note 18, at 18.

[23] *Id.* at 58, 63.

[24] Spencer Ackerman, *Homeland Security Wants to Spy on 4 Square Miles at Once*, Wired Danger Room Blog, Jan. 23, 2012, http://www.wired.com/dangerroom/2012/01/homeland-security-surveillance/.

[25] DHS, *Wide Area Aerial Surveillance System, Draft RFP, Solicitation No. RSBR-12-00016*, 10 (Jan. 23, 2012),  https://www.fbo.gov/utils/view?id=77dd22db2f231614c7576486c63fdc32.

[26] Andrew Becker, *New Drone Radar Reveals Border Patrol 'Gotaways' in High Numbers*, Center for Investigative Reporting, Apr. 4, 2013, http://cironline.org/reports/new-drone-radar-reveals-border-patrol-gotaways-high-numbers-4344.

-4-

CASE NO: 12-CV-5580 PJH    NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM.
J.; OPP. TO DEF'S MOT. SUMM. J.

VADER—for Vehicle and Dismount Exploitation Radar . . . can cover a wide swath of land and follow movement as it happens."[27]

CBP flies its drones for its own missions and on behalf of other agencies for non-border patrol purposes. On December 10, 2011, the *Los Angeles Times* reported that CBP used one of its Predator drones to help the Nelson County Sheriff's Department in North Dakota to find three individuals suspected of committing a property theft.[28] In a second article on April 28, 2012, the *Times* reported that CBP "drones often are unavailable to assist border agents because Homeland Security officials have lent the aircraft to the FBI, Texas Rangers and other government agencies for law enforcement, disaster relief and other uses."[29] In a May 30, 2012 DHS Office of Inspector General (OIG) Report on CBP's unmanned aircraft program, the OIG noted that "CBP had flown missions to support the following stakeholders:

    a.   Department of Homeland Security (DHS) agencies, including Office of Border Patrol, United States Secret Service, Federal Emergency Management Agency (FEMA), and Immigration and Customs Enforcement (ICE);

    b.   Bureau of Land Management;

    c.   Federal Bureau of Investigation;

    d.   Department of Defense;

    e.   Texas Rangers;

    f.   United States Forest Service; and

    g.   National Oceanic and Atmospheric Administration (NOAA)."[30]

The OIG Report also noted that "[a]t the request of the State Department, [CBP] participated in discussions with another country on the use of unmanned aircraft."[31]

---

[27] *Id*.

[28] *See* Bennett, *supra* note 4.

[29] Brian Bennett, *Predator Drones Have Yet to Prove their Worth on Border*, L.A. Times, Apr. 28, 2012, http://articles.latimes.com/2012/apr/28/nation/la-na-drone-bust-20120429.

[30] *DHS OIG Drone Report*, *supra* note 20, at 6.

[31] *Id*. at 7.

-5-

CASE NO: 12-CV-5580 PJH    NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM.
J.; OPP. TO DEF'S MOT. SUMM. J.

According to the CONOPS Report, CBP plans to make its drones and the data gathered through its drone surveillance even more widely available to outside agencies in the near future. For example, CBP plans to share data on a near real-time basis, possibly "via DOD's Global Information Grid (GIG)/Defense Information Systems Network[.]"[32] CBP also plans that "[j]oint DHS and OGA [other government agency] combined operations will become the norm at successively lower organizational hierarchical levels."[33]

## C.   Public Attitude About Drones

Since EFF began making drone records obtained from a separate FOIA lawsuit available to the public,[34] people throughout the United States have been increasingly concerned with excessive drone surveillance by the government. Bills to place restrictions on drone flights and drone surveillance have been introduced by Democrats and Republicans in both houses of Congress and in 42 states.[35] Legislation has passed in eight states, and in one extreme example, Virginia placed a two-year moratorium on all drone flights except for emergencies.[36] While most of this legislation has addressed use of drones by traditional state and federal law enforcement, Senator Dianne Feinstein added an amendment to the recent immigration bill that would have sharply restricted CBP drone flights in California. By limiting these flights to a distance of only three miles from the U.S. border with Mexico, Senator Feinstein was hoping to prevent near-constant drone surveillance over the "several million people [living] within a hundred miles of the border, in cities in Orange County, San Diego County, reaching all the way up to Long Beach."[37]

---

[32] *CONOPS Report*, *supra* note 18 at 20.

[33] *Id*. at 65.

[34] *See EFF v. Dept. of Transp*., Case No. 12-00164 CW (N.D. Cal. 2012)) (Federal Aviation Administration drone authorization records released as a result of the FOIA litigation are available at EFF, *Drone Flights in the U.S*., https://www.eff.org/foia/faa-drone-authorizations).

[35] Allie Bohm, *Status of Domestic Drone Legislation in the States*, ACLU Blog, Oct. 9, 2013, https://www.aclu.org/blog/technology-and-liberty/status-domestic-drone-legislation-states.

[36] Virginia General Assembly Legislative Information System, *An Act to Place a Moratorium on the Use of Unmanned Aircraft Systems*, Apr. 3, 2013, http://leg1.state.va.us/cgi-bin/legp504.exe?131+ful+CHAP0755.

[37] Brian Bennett, *Immigration Bill Would Restrict Drone Use in California*, L.A. Times, May 14, 2013, http://articles.latimes.com/2013/may/14/news/la-pn-immigration-bill-drones-california-20130514.

-6-

CASE NO: 12-CV-5580 PJH    NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM.
J.; OPP. TO DEF'S MOT. SUMM. J.

### D.   EFF's FOIA Requests For Records Related to CBP's Drone Flights

The Office of Inspector General criticized CBP for failing to "ensure[] that adequate resources are available to effectively operate its unmanned aircraft[,]" for lacking a standardized process for stakeholders such as the FBI to request assistance from CBP's drones, and for failing to obtain reimbursement for stakeholder flights, noting that "a standardized process would provide transparency."[38]   However, after the report, CBP failed to increase transparency around its "drone loan" program. Given this, EFF filed a FOIA request with the agency in June 2012 to obtain more information about its program. EFF filed this lawsuit after the agency failed to respond to that request. The request sought three categories of records:

> (1)   CBP and/or DHS policies or procedures for responding to requests from other agencies (including agencies at the federal, state and local level) for assistance involving the use of CBP's Predator drones;

> (2)   records or logs of CBP drone flights to assist in any operation or activity of another agency (including foreign, federal, state, and local government agencies), including records or logs that detail when the drones were used for these purposes, which outside agency requested the flight, how long the flight lasted, the geographic area over which the drone was flown, and information about the reason for the assistance request or purpose of the flight;

> (3)   a copy of the "Concept of Operations for CBP's Predator B Unmanned Aircraft System, FY 2010 Report to Congress" discussed in the OIG May 2012 report at p. 7 (OIG-12-85).

After a year of negotiations and several rounds of productions, CBP has completed processing and produced records in response to EFF's requests. The parties have worked to narrow the issues presented in their Cross Motions before the Court, as described in Defendant's Cross Motion at pp. 3-4. The only remaining exemption claim at issue is Exemption 7(E). EFF does not challenge the adequacy of Defendant's search.

## III.   ARGUMENT

### A.   The Freedom of Information Act and the Standard of Review

The FOIA is intended to safeguard the American public's right to know "what their

---

[38] *DHS OIG Drone Report*, *supra* note 20, at 3, 7.

Government is up to." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citation omitted).  The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (citation omitted). FOIA requests must be construed liberally, and "disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). The Supreme Court has stated that "[o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within [FOIA's] statutory purpose." *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989).

The FOIA requires an agency to disclose records at the request of the public unless the records fall within one of nine narrow exemptions. *See* 5 U.S.C. § 552(b). The exemptions "have been consistently given a narrow compass," and agency records that "do not fall within one of the exemptions are improperly withheld[.]" *DOJ v. Tax Analysts*, 492 U.S. 136, 151 (1989) (internal quotation marks omitted); *see also NLRB*, 437 U.S. at 221; *Nat'l Wildlife Fed'n v. U.S. Forest Service*, 861 F.2d 1114, 1116 (9th Cir. 1988).

FOIA disputes involving the propriety of agency withholdings are commonly resolved on summary judgment. *See, e.g.*, *Nat'l Wildlife Fed'n*, 861 F.2d at 1115. Summary judgment is proper when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Feshbach v. SEC*, 5 F. Supp. 2d 774, 779 (N.D. Cal. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party who bears the burden of proof on an issue at trial "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Feshbach*, 5 F. Supp. 2d at 779. "In contrast, a moving party who will not have the burden of proof on an issue at trial can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id*.

A court reviews the government's withholding of agency records *de novo*, and the government bears the burden of proving that a particular document falls within one of the nine

narrow exemptions. 5 U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755. An agency must prove that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (citation and quotation omitted). When claiming an exemption, the agency must provide a "'relatively detailed justification' for assertion of an exemption and must demonstrate to a reviewing court that records withheld are clearly exempt." *Birch v. USPS*, 803 F.2d 1206, 1209 (D.C. Cir. 1986) (citing *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). An agency may submit affidavits to satisfy its burden, but "the government 'may not rely upon conclusory and generalized allegations of exemptions.'" *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (quoting *Church of Scientology of Cal. v. Dep't of Army*, 611 F.2d 738, 742 (9th Cir. 1979). All doubts as to whether a FOIA exemption applies are resolved in favor of disclosure. *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

### B. EFF is Entitled to Summary Judgment Because the Government Has Improperly Withheld Agency Records

As described in detail below, Defendant has failed to satisfy its burden of proving that it has released all non-exempt material in response to EFF's FOIA requests. As a result, the Court should deny the government's motion for summary judgment and grant EFF's Cross Motion, requiring Defendant to release all material it has improperly withheld under the FOIA.

#### 1. Defendant Improperly Withheld Records Under Exemption 7(E)

As Defendant notes, the only remaining exemption at issue is 5 U.S.C. § 552(b)(7)(E) Exemption 7(E). (*See* Def. Mot. at 10.) Exemption 7(E) allows an agency to withhold documents "compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations or prosecutions" only if the agency demonstrates a reasonable risk that criminals will use the information to circumvent detection, apprehension or prosecution. 5 U.S.C. § 552(b)(7)(E); *Gordon v. FBI*, 388 F. Supp. 2d 1028, 1035-36 (N.D. Cal. 2005).

-9-

Case No: 12-cv-5580 PJH   Not. of Cross Mot. Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.; Opp. to Def's Mot. Summ. J.

Contrary to Defendant's claims, (Def. Mot. at 8-9), courts in the Ninth Circuit have held the government must show a reasonable risk of circumvention for *both* law enforcement "guidelines" *and* "techniques or procedures." *See, e.g. Feshbach*, 5 F. Supp. 2d at 786 n.11 (relying on *Davin v. DOJ*, 60 F.3d 1043, 1064 (3d Cir. 1995) and specifically discrediting the government's argument that it need not show risk of circumvention for techniques and procedures); *Council on American-Islamic Relations, Cal. v. FBI*, 749 F. Supp. 2d 1104, 1123 (S.D. Cal. 2010) ("In the Ninth Circuit, to invoke Exemption 7(E), 'the government must make two showings: (1) that the records were compiled for a law enforcement purpose, and (2) that the records reveal law enforcement techniques or guidelines that, if disclosed, "could reasonably be expected to risk circumvention of the law."' (citations omitted)); *Gordon*, 388 F. Supp. 2d at 1035. The government must prove reasonable risk of circumvention of the law "by detailed affidavit or other evidence." *EFF v. DOD*, Case No. 09-05640 SI, 2012 U.S. Dist. LEXIS 137010, 8 (N.D. Cal. Sept. 24, 2012) (citing *Feshbach*, 5 F. Supp. 2d at 787). Ninth Circuit case law holds that Exemption 7(E) "only exempts investigative techniques not generally known to the public." *Rosenfeld v. DOJ*, 57 F.3d 803, 815 (9th Cir. 1995) (citation omitted).

Defendant has withheld two general types of information from both the Daily Reports and the CONOPS Report—location-based information and operational information. Defendant has failed to show that disclosing these records would lead to circumvention or that the records describe techniques not generally known to the public.

(a)     *Daily Reports—Location Information*

Defendant has withheld various types of location information from the Daily Reports, including locations of operations, maps, and the names of various county sheriffs' departments. Defendant has not shown that this information is so precise that releasing it would allow a criminal in the area to know he was under investigation and that there is a corresponding risk of circumvention of the law.

For example, Defendant argues releasing county names would "reveal a considerably targeted, precise location where OAM operates." (Def. Mot. at 12.). However, counties are, in

-10-

general, so large that releasing their names would not lead to circumvention of the law. For example, the average size of counties in the United States is 997.6 square miles.[39] In Western states, where CBP conducts many of its drone flights, counties are even larger. In Arizona, where CBP bases at least four of its Predators,[40] the average county size is 7,573 square miles, and the largest county—Coconino—is 18,619 square miles.[41] Maricopa County, where Phoenix is located, is 9,224 square miles and has a population of 3,817,117.[42] It is the fourth most populous county in the United States, and has a land area greater than that of seven states.[43] Pima County, Arizona, which shares a border with Mexico, is approximately 9,200 square miles, and has a population of nearly 1 million people.[44]

It is well known that there is a significant amount of criminal activity in this area. CBP states in its CONOPS Report that "the Southwest Border Region," which includes Arizona and the Phoenix metropolitan area, "is the most significant storage, transportation and trans-shipment area for illicit drug shipments destined for the U.S. drug market" and that the threats in this area are not limited to drug crimes but also include "other criminal activities, including border violence, firearms trafficking, money laundering, and undocumented migrant smuggling."[45] Pima County states it has one of the highest crime rates in the country—a "rate of 4,983 crimes per 100,000

---

[39] *See* Wikipedia, *County Statistics of the United States*, https://en.wikipedia.org/wiki/County_statistics_of_the_United_States (as of Oct. 22, 2013, 9:42 GMT).

[40] *See* U.S. Customs & Border Protection, *CBP Receives Fourth Predator-B in Arizona* (Dec. 27, 2011), http://www.cbp.gov/archived/xp/cgov/newsroom/news_releases/archives/2011_news_archive/12272011.xml.html.

[41] *Id*.

[42] *See* Wikipedia, *Maricopa County, Arizona*, https://en.wikipedia.org/wiki/Maricopa_County,_Arizona (as of Oct. 22, 2013, 9:42 GMT).

[43] *Id*.

[44] *See* Pima County, Arizona, *About Pima County*, http://webcms.pima.gov/cms/One.aspx?portalId=169&pageId=18539 (last accessed Oct. 22, 2013).

[45] *CONOPS Report*, *supra* note 18, at 37.

-11-

CASE NO: 12-cv-5580 PJH    NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM.
J.; OPP. TO DEF'S MOT. SUMM. J.

population."[46] This includes 1,712 drug cases—of which 1,483 defendants pled guilty—in 2012 alone.[47]

Given the size and populations of these counties and their high crime rates, it is hard to imagine that releasing location information such as county names—or releasing other location information withheld in this case—would allow suspected criminals in the area to link CBP's drone surveillance to their particular criminal activity. This is further supported by the fact that Predator flights appear to be visible from the ground,[48] suggesting people have some knowledge that a drone is conducting surveillance in the area.

CBP also argues that combining location information with the date of the operation "would allow targets of investigations to determine the government's awareness of their illegal activities." (Def. Mot. at 11.) However, EFF has waived its challenge to the dates of operations in the Daily Reports, so this is not an issue. *See* Eckardt Decl., Ex. 1 (showing that the various dates of operation in the Daily Reports are "Not challenged"). EFF has also waived its challenge to the "Specifics about a case." Given this, CBP has not shown that merely releasing the location information at issue in this case would lead to circumvention of the law.

(b)     *Daily Reports—Type of Operation and Operational Capabilities*

CBP argues that release of operational information "would enable persons to deduce ways to circumvent CBP's law enforcement efforts" and "could increase the risks that a law will be violated." However, CBP has not shown that the techniques and procedures it is withholding are

---

[46] Pima County Attorney's Office, Criminal Division, http://www.pcao.pima.gov/criminaldivision.aspx (last accessed Oct. 22, 2013).

[47] *Id.* (Narcotics Unit).

[48] *See, e.g.*, Andrew Becker & G.W. Schulz, *At U.S. Border, Expensive Drones Generate Lots of Buzz, Few Results*, Center for Investigative Reporting, June 15, 2012, http://cironline.org/reports/us-border-expensive-drones-generate-lots-buzz-few-results-3602 (noting that "[a] few of the migrants [apprehended by Border Patrol] asked about the 'camera in the sky' that had caught them"); Timothy Coon, *First Hand Account of Predator Drone Sighting*, YouTube (Jul. 26, 2013), http://youtu.be/YaZMZjlveWs; 420Homestead, *Drone Sighting in Arizona*, YouTube (Feb. 22, 2013), http://youtu.be/x3A71eul8k4.

"not generally known to the public." *Rosenfeld*, 57 F.3d at 815 (adopting this requirement "as the law of" the Ninth Circuit).

Federal agency defendants cannot withhold information about techniques or procedures that "would leap to the mind of the most simpleminded investigator." *Id.* (citations omitted). Further, the government cannot withhold information under (7)(E) "simply by saying that the 'investigative technique' at issue is not the practice but the application of the practice to the particular facts underlying that FOIA request." *Id.* In *Albuquerque Publishing Co. v. Dept. of Justice*, the court directed agencies to release records "pertaining to techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television," including "eavesdropping, wiretapping, and surreptitious tape recording and photographing." 726 F. Supp. 851, 858 (D.D.C. 1989); *see also Hamilton v. Weise*, No. 95-1161, 1997 U.S. Dist. LEXIS 18900, at *30-32 (M.D. Fla. Oct. 1, 1997) (generally known techniques include those discussed in judicial opinions); *Rosenfeld*, 57 F.3d at 815 (details about a pretextual phone call were not protected because the technique would "leap to the mind of the most simpleminded investigator"); *Dunaway v. Webster*, 519 F. Supp. 1059, 1082-83 (N.D. Cal. 1981) (describing law enforcement technique for gaining access to suspects' physical mail as "commonly known").

Here, despite the requirement in the Ninth Circuit that information withheld must not be well-known, *see Rosenfeld*, 57 F.3d at 815, Defendant fails to even cite a Ninth Circuit appellate or district court case in support of its argument. The two District of Columbia district court cases it cites—*Lewis-Bey v. DOJ*, 595 F. Supp. 2d 120, 138 (D.D.C. 2009) and *Durrani v. DOJ*, 607 F. Supp. 2d 77, 91 (D.D.C. 2009)—do not address this issue, and Defendant has failed to show independently that the techniques withheld are not routine or well-known to the public.

As Defendant admits, many operational capabilities and vulnerabilities of Predator drone surveillance and of Border Patrol in general are already widely known. General Atomics, the Predator's manufacturer, provides a large amount of information on Predator capabilities its own website.[49] Wikipedia has additional information that details CBP's drones' surveillance equipment

---

[49] *See* General Atomics Aeronautical, *Predator B UAS*, http://www.ga-asi.com/products/aircraft/predator_b.php (last accessed Oct. 22, 2013).

-13-

CASE NO: 12-CV-5580 PJH      NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.; OPP. TO DEF'S MOT. SUMM. J.

and several problems the agency has had with its drones in the past.[50] CBP officers have testified to Congress on the Predator's ability to track drug-smuggling aircraft.[51] A Center for Investigative Reporting article discusses weather problems that hamper drone flights, noting that "winds often keep the drones on the ground" and that in "two visits to the base pilots could not launch or retrieve crafts because of weather conditions."[52] A CBS News article discusses the risk that the live video feed from Predators can be intercepted.[53] A Department of Defense survey "showed that 57 percent of accidents until 2005 were caused by flight control issues or engine or transmission problems . . . [and] 14 percent of failures involved lost communication links."[54] In a statement to Congress, CBP's Major General Michael Kostelnik discussed the fact that CBP's sensors often cannot discriminate between criminal and non-criminal activity. He said, "[a]t a standard 15 sensor activations, 12 of them might just be the wind. Two might be animals. One might be a group of migrants, and one might be a big group carrying drugs."[55] CBP documents released in response to a FOIA request to the Center for Investigative Reporting showed that, despite the addition of a sophisticated but costly new surveillance system that allows a drone to fly "over a wide swath of land and follow movement as it happens," CBP has been unable to apprehend most of the people and vehicles detected by the system.[56] Not only could the system not distinguish between citizens

---

[50] Wikipedia, *General Atomics MQ-9 Reaper*, https://en.wikipedia.org/wiki/General_Atomics_MQ-9_Reaper (as of Oct. 22, 2013, 9:42 GMT).

[51] *See, e.g.*, Testimony of Michael C. Kostelnik, Assistant Commissioner, Office of Air and Marine, U.S. Customs and Border Protection (July 15, 2010), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg64701/html/CHRG-111hhrg64701.htm, 10 (describing how Predators can track and interdict small, single-manned ultralight planes carrying drugs across the border).

[52] Becker & Schulz, *supra* note 48.

[53] Declan McCullagh, *U.S. was Warned of Predator Drone Hacking*, CBS News, Dec. 17, 2009, http://www.cbsnews.com/8301-504383_162-5988978-504383.html.

[54] Nidhi Subbaraman, *Drones Crash (a lot) but the Military's Safety Lessons May Help Civilians*, NBC News, Mar. 20, 2013, http://www.nbcnews.com/technology/drones-crash-lot-militarys-safety-lessons-may-help-civilians-1C8932488.

[55] Tom Barry, *The Numbers Game: Government Agencies Falsely Report Meaningless Deportations and Drug Seizures as Victories*, Center for International Policy, Jan. 16, 2012, http://www.ciponline.org/research/entry/numbers-game-government-agencies-falsely-report-meaningless-deportation.

[56] Becker, *supra* note 26.

-14-

CASE NO: 12-CV-5580 PJH     NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM.
J.; OPP. TO DEF'S MOT. SUMM. J.

and non-citizens, but even if it does detect activity, "Border Patrol agents often are not available to respond because of rugged terrain or other assignments. As a result, thousands of people have slipped through."[57] A 2010 Congressional Research Service report noted many problems with CBP's drone program, including communications failures between drones and their pilots and very specific weather issues that ground Predators, affect their sensors, and distort their imagery;[58] and, earlier this year, several news outlets published an al Qaeda-produced 22-step guide to evading drone strikes (many of which are conducted by the same Predator drones used by CBP).[59]

Based on these and other sources, it is clear that information about Predator drones' operational capabilities and vulnerabilities is already widely known. As such, this information cannot be withheld under Exemption 7(E).

(c)   <i>CONOPS Report</i>

For the same reasons noted above in regards to the Daily Reports, Defendant has failed to show that the law enforcement techniques and location information discussed in the CONOPS Report are not generally known or that the information in the report is so specific that its release would present a reasonable risk of circumvention of the law.

For example, Defendant has withheld information on "gaps in homeland security and operational capability in monitoring" that show "the specific areas that present difficulty to the agency in detecting criminal activity." (Eckardt Decl. at ¶ 21.) However, as discussed above, CBP has already made much information about its gaps in operational monitoring capabilities available to the public through other reports, news articles and statements to Congress. It cannot now withhold this same information here.

---

[57] *Id.*

[58] Chad C. Haddal & Jeremiah Gertler, *Homeland Security: Unmanned Aerial Vehicles and Border Surveillance*, Congressional Research Service, 2, 4 (July 8, 2010) http://www.fas.org/sgp/crs/homesec/RS21698.pdf.

[59] *See, e.g., Al Qaeda Drone Guide: 22 Steps To Evading Unmanned Aircraft Strikes*, Huffington Post, Feb. 22, 2013, http://www.huffingtonpost.com/2013/02/22/al-qaeda-drone-guide-22-steps_n_2743867.html; *see also* 2LT Website Administrator, *How to Hide from Predator Drones UAV – Unmanned Aerial Vehicles Survival Guide*, Mar. 24, 2013, http://uscrow.org/2013/03/24/how-to-hide-from-predator-drones-uav-unmanned-aerial-vehicles-survival-guide/.

Defendant has also withheld information about airspace restrictions showing "the airspace in which OAM has authority to operate[,]" arguing that releasing this information would allow people "to identify the geographical areas in which OAM does not operate and which directly affect law enforcement technique in the region." (Eckhardt Decl. at ¶ 21.) Although Defendant asserts this "would risk circumvention of the law," CBP has not provided any evidence to show this is the case. Defendant testified before Congress in 2010 that its Certificates of Authorization allow it to operate "from the eastern tip of California, across the land borders of Arizona, New Mexico, and Texas, and into the maritime border just short of the Texas and Louisiana border" and that it was working with the FAA to "expand access from 240 to over 900 miles along the northern border, west of North Dakota, and . . . back to the Great Lakes and St Lawrence Seaway."[60] Releasing this information has not presented a reasonable risk of circumvention of the law.

Further, it is unlikely that releasing information on where CBP is authorized to fly its drones would affect actual criminal activity on the ground, in the sea or in the air, because CBP does not rely on drones alone to investigate or interdict illegal activity. Its drones are part of a coordinated approach to dealing with drug smuggling and illegal immigration, and often the failure of the agency to stop this activity is not due to the drone but due to problems on the ground from a lack of agents in the area or rugged terrain.[61] There is no indication that illegal activity in this case would be affected one way or the other if the suspects knew one of the agency's Predators was conducting surveillance in the area.[62]

Given that Defendant has not shown the information withheld from either the Daily Reports or the CONOPS Report is not generally known, or that its disclosure would likely lead to circumvention of the law, the information is improperly withheld under Exemption 7(E) and should be released.

---

[60] *Supra* note 51 (Prepared Statement of Michael C. Kostelnik).

[61] Becker, *supra* note 26.

[62] As previously noted, Predator flights appear to be visible from the ground, which suggests criminals may already be aware they are being surveilled by the drones. *See* text accompanying note 48.

2.     Defendant Has Failed to Segregate and Release All Non-Exempt Information from the CONOPS Report[63]

The FOIA explicitly requires that "[a]ny reasonably segregable potion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]" 5 U.S.C. § 552(b). This means that all non-exempt portions of a document must be disclosed unless they are "inextricably entwined" with the exempt portions. *Willamette Indus. v. United States*, 689 F.2d 865, 867 (9th Cir. 1982) (citing *Mead Data Cent.*, 566 F.2d at 260-61). "In the Ninth Circuit, the district court must review the agency's 'segregability' decisions on a document-by-document basis." *NRDC v. DOD*, 388 F. Supp. 2d 1086, 1096 (C.D. Cal. 2005) (citing *Wiener v. FBI*, 943 F.2d 988 (9th Cir. 1991)). The court must also "make specific factual findings on the issue of segregability to establish that the required *de novo* review of the agency's withholding decision has in fact taken place." *Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State*, 818 F. Supp. 1291, 1296 (N.D. Cal. 1992) (citing *Wiener*, 943 F.2d at 988).

The duty to segregate extends to material withheld under all of the FOIA's nine exemptions. *Id*. The agency bears the burden of proving that it properly segregated. 5 U.S.C. § 552(a)(4)(B). To satisfy its burden, the agency must "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent.*, 566 F.2d at 261; *see also NRDC v. DOD*, 388 F. Supp. 2d at 1105 (finding an agency declaration inadequate on segregability grounds when it stated merely that "none of the withheld documents contain reasonably segregable information that is not exempt").

Defendant states that it has provided "all segregable, non-exempt information from documents that are responsive to the request and subject to the FOIA." (Def. Mot. at 16.) Defendant also argues that because it has not withheld any records in full, this shows it has reasonably segregated exempt portions. Despite this assurance, many pages of the CONOPS Report contain large blocks of redacted text, thus concealing entire sentences and paragraphs from public disclosure. For example, pages 13-14 and 60-61 of the CONOPS Report are almost completely redacted. (*See* Eckardt Decl., Ex. 2, Doc No. 27-4.) Many other pages of the Report,

---

[63] Plaintiff does not challenge segregation in the Daily Reports.

-17-

CASE NO: 12-CV-5580 PJH     NOT. OF CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.; OPP. TO DEF'S MOT. SUMM. J.

such as pages 37, 40, 41, 45, 47, 49, 50, 55, 57, 59, 62, and 63, have heavy redactions that block out whole sections. (*Id.* Doc Nos. 27-4; 27-5.)

Given the large blocks of text withheld, the general nature of the CONOPS Report, and the fact that the law enforcement techniques and procedures discussed in it are likely known to the public, it is probable that Defendant has withheld more information than is otherwise justifiable.

The examples discussed above only underscore the need for this Court's searching review of Defendant's compliance with FOIA's obligation to provide "[a]ny reasonably segregable potion" of the records at issue in this case. *See* 5 U.S.C. § 552(b). Thus, despite Defendant's assertions that it has complied with FOIA's segregability requirement, Defendant has not satisfied its burden and is not entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be denied, and EFF's Cross Motion for summary judgment should be granted.

DATED:  October 23, 2013                    Respectfully submitted,


                                             */s/ Jennifer Lynch*
                                            Jennifer Lynch
                                            ELECTRONIC FRONTIER FOUNDATION
                                            815 Eddy Street
                                            San Francisco, CA  94109
                                            Telephone:  (415) 436-9333 x 136
                                            Facsimile:  (415) 436-9993

                                            Attorney for Plaintiff
                                            ELECTRONIC FRONTIER FOUNDATION